Denholm & McKay Company v. Commissioner.
Denholm & McKay Co. v. Commissioner
Docket No. 5541.
United States Tax Court
1946 Tax Ct. Memo LEXIS 170; 5 T.C.M. (CCH) 476; T.C.M. (RIA) 46132; June 5, 1946
*170 1. Petitioner has failed to prove that respondent abused his discretion in disallowing any addition in the taxable year to petitioner's reserve for bad debts. 2. Depreciation allowable on certain fixed asset accounts determined. 3. Petitioner is not entitled to deduct as a loss in the taxable year the amount of $25,000 paid on its own mortgage notes, although the mortgaged property had been transferred to another company, where, despite the mortgagee's refusal to release petitioner from its liability on the notes, the other company agreed with petitioner to assume and pay the mortgage, and the possibility of recoupment or reimbursement from that company was not remote but substantial. Howe P. Cochran, Esq., Union Trust Bldg., Washington, D.C., and Margaret F. Luers, Esq., for the petitioner. Carl A. Stutsman, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves income and excess profits tax deficiencies for the fiscal year ended January 31, 1941, in the respective amounts of $5,520.70 and $4,488.95. Petitioner does not contest certain adjustments made by respondent, and only three issues remain for decision. They are: Whether petitioner is entitled to a deduction of $3,910.14 as a reasonable addition to its bad debt reserve; whether petitioner is entitled to depreciate its Furniture & Equipment Account and its Building Repairs Account over a life span of 10 years or of 20 years, and whether petitioner is entitled to a loss deduction in the amount of $25,000 because of a payment in that amount made by petitioner, at the demand of a mortgagee, in reduction of the principal of certain mortgage notes. Some of the facts have been stipulated and are hereby adopted. Others *172 are found from the evidence. Findings of Fact Petitioner is a Massachusetts corporation with principal place of business at Worcester, where it operates a department store. Its books are kept on an accrual basis for a fiscal year ending January 31. Its tax returns for the year here involved were filed with the collector for the district of Massachusetts at Boston. Petitioner uses the reserve method of treating bad debts. At the beginning of the tax year in controversy the adjusted balance in its reserve account was $15,111.33. In the course of the year petitioner charged off bad debts in the amount $15,820.68 and made recoveries of bad accounts in the amount of $13,078.73. At the beginning of the year its trade accounts receivable amounted to $431,005.67, and at the close of the year the amount was $484,699.90. On January 31, 1941, the balance in the reserve account, before any addition thereto, was $12,369.38. Petitioner then credited to the reserve and charged to profit and loss the amount of $3,910.14 and claimed deduction therefor. Respondent refused to allow any deduction for addition to the bad debt reserve. Petitioner follows a practice of charging off any account more *173 than five months overdue. Its bad debt recoveries average, roughly, 60 per cent of the charge-offs. Respondent determined that over a five-year period, consisting of the tax year involved and the four preceding years, the ratio of petitioner's average net bad debt losses to average receivables was 1.67 per cent. The ratio of the balance of $12,369.38 in the reserve at January 31, 1941, without any addition thereto, to the receivables of $484,699.90 on that date was 2.55 per cent. In its return petitioner claimed depreciation in the amount of $23,729.74, the aggregate of depreciation items on eight accounts of depreciable assets. Of this amount the respondent disallowed $10,001.72 attributable, in the main, to reductions made in the depreciation claimed on the Furniture & Equipment Account, from $12,688.57 to $4,623.92, and in that claimed on the Autos & Trucks Account, from $2,886.67 to $998.79. The latter adjustment is not contested by petitioner. On a third account, the Building Repairs Account, petitioner claimed in its return a depreciation of $2,084.77 and respondent allowed $2,084.78. Respondent's adjustment to the Furniture & Equipment Account was made on the basis of an *174 average life span of 20 years. That account includes such items as dress and bathing suit hangers, stands for displaying dresses, bulletin frames, spotlights, counter trays and drawers, mannequins, wigs, racks, carpeting, file cabinets, showcases, chairs and benches, linoleum, electric window display units, counters, shelves, panels, Venetian blinds, billing machines, etc. The hangers and stands have a useful life of from two to three years; some of the other items have life spans of five years, others seven or eight years and still others as long as 15 years. The largest single items in the account are the billing machines, which cost $1,300 each and of which petitioner has seven. The useful life of these machines is about 10 years. The average life span of the Furniture & Equipment Account for depreciation purposes is 10 years. In its Building Repairs Account petitioner capitalized such items as painting the interior of the main store building and painting the stock room building it owns on High Street, the installation of shelves and partitions in the stockrooms, repairs of the elevator system in the main building, etc. The largest single item in the account consists of the elevator *175 repairs, amounting to between $10,000 and $13,000. The elevators are of the hydraulic type, and the expenditures for the repairs were made in the years 1937 through 1939 for the replacement of the water pressure tank and connecting pipe. Petitioner used the best materials obtainable at the time and the same equipment was still in use at the time of the hearing in this proceeding. Prior to 1916, petitioner owned the property in which it conducts its department store business. The land and buildings were covered by mortgages to Clark University, securing notes for $750,000, dated December 30, 1908, $150,000, dated July 1, 1914, and $100,000, dated October 15, 1915. All of the notes were payable January 1, 1927, and have never been renewed. On or about August 23, 1916, the Denholm & McKay Realty Co., hereinafter referred to as the "Realty Co." was organized by three individuals, who were officers of petitioner. The entire common stock of the Realty Co., 500 shares of $100 par value, was issued to them. On or about August 31, 1916, petitioner transferred the store property to the Realty Co., and the latter agreed to assume and pay the mortgages held by Clark University. Clark University, *176 however, refused to release petitioner from its liability on the mortgage notes. All the preferred stock of the Realty Co., 10,000 shares at $100 par value, 7 per cent cumulative dividend, was issued to petitioner in consideration of the transfer of the property. Since that time petitioner has been the lessee of the Realty Co.
Some time after the transfer of the property to the Realty Co., that company borrowed money from banks on the endorsement of petitioner and purchased from petitioner about 3,000 shares of its own preferred stock to be held as treasury stock. Petitioner offered to its preferred stockholders to exchange Realty Co. preferred stock for their preferred stock in petitioner, and approximately half of petitioner's stockholders accepted the offer. In about 1923, petitioner acquired all the common stock of the Realty Co. and has since owned it continuously. As of the taxable year, petitioner owned 252 shares of the Realty Co. preferred stock, 2,862 shares were held in the Realty Co. treasury, and 6,886 shares were in the hands of some 400 members of the public. Petitioner had endorsed the preferred stock of the Realty Co. and guaranteed both the cumulative 7 per cent *177 dividend and the redemption of the stock at $110 per share upon liquidation of the Realty Co. The preferred stock carried no voting rights unless there were dividend arrearages. There were no dividend arrearages on the stock in the taxable year, although there had been in prior years and petitioner had paid off the arrearages. Under the lease agreement the rent paid by petitioner consisted of the taxes and operating expenses of the Realty Co., plus an amount sufficient to cover the 7 per cent dividend on the preferred stock of the Realty Co.
The principal asset of the Realty Co. consisted of the department store property leased to petitioner and carried on the Realty Co. books during the taxable year at a valuation of $1,503,800, less a depreciation reserve of $359,780. The fair market value of the property throughout the year was $1,250,000. The principal liabilities of the Realty Co. carried on its books were the mortgages payable to Clark University in the amount of $1,000,000 and $320,558.89 accounts payable to petitioner. Its capital stock consisted of preferred stock of $1,000,000, $286,200 of which was treasury stock, and common stock of $50,000. During the year in question *178 Clark University demanded a payment of $25,000 on the principal of the mortgages. Petitioner made an effort to place a mortgage elsewhere but was unsuccessful. Petitioner's officers considered that if the mortgages were forclosed the property would sell for no more than sufficient to pay off the mortgages and a part of the open account owing to petitioner, and that petitioner would be faced with the prospect of having to redeem all the preferred stock of the Realty Co. which it had guaranteed. Petitioner thereupon paid the $25,000 to Clark University and charged the amount off to profit and loss. On the books of the Realty Co. the sum of $25,000 was charged to the mortgage payable account and credited to the account payable to petitioner. Throughout the taxable year and up until the time of the hearing in this proceeding the Realty Co. was a going concern. Petitioner claimed a deduction in the amount of $25,000 as a loss, and respondent disallowed it. Opinion ARUNDELL, Judge: Respondent determined that according to petitioner's actual past experience over a period of five years, petitioner's net bad debt losses averaged only 1.67 per cent of outstanding accounts receivable and, *179 since the reserve at the end of the taxable year was greater than that amount (about 2.55 per cent of outstanding accounts receivable), refused to allow any addition thereto. Petitioner sought a deduction of $3,910.14, and its treasurer testified that in his opinion the claimed amount was a reasonable addition to the reserve. No facts and figures, however, were adduced to disprove respondent's determination with regard to petitioner's actual past experience. Upon cross-examination, petitioner's treasurer, when asked what method he followed in determining amounts to be added, replied that he aged the accounts receivable and set up a reserve which he thought fair to cover anticipated losses. He stated that in his opinion a reserve amounting to approximately 10 per cent of the accounts receivable was reasonable, but he admitted that it was only an estimate based on his experience, for he had made no calculations to determine that figure or to ascertain that petitioner's losses had averaged 10 per cent of receivables. Under the circumstances, and in the absence of evidence as to any unusual factors or conditions which would require or justify a larger reserve than petitioner already had, *180 we think the bare opinion testimony of petitioner's treasurer is unconvincing. In view of the special discretionary authority conferred upon the Commissioner by section 23(k) of the Internal Revenue Code in connection with reserves for bad debts, we do not feel warranted, on the basis of the present record, in disturbing the respondent's determination on this issue. See C. P. Ford & Co., Inc., 28 B.T.A. 156. The next issue relates to the depreciation allowable in connection with petitioner's Furniture & Equipment Account and its Building Repairs Account. In its return for the taxable year petitioner claimed depreciation on the Furniture & Equipment Account in the amount of $12,688.57. Respondent allowed only $4,623.92 based upon an average useful life of 20 years for the account as a whole. It appears that for a long period of time petitioner has been depreciating this account on the basis of an average life of 10 years, and petitioner contends that is the proper basis. We think the evidence supports petitioner in connection with this account. There is some evidence to indicate that the revenue agent did not make an inspection of the physical items *181 reflected in the account before recomputing depreciation on the 20-year basis rather than a 10-year basis. In any event, however, from the testimony of petitioner's treasurer as to the character of the items making up the account and the average life of a number of different kinds of equipment, we conclude that the average life span of the account as a whole is 10 years, and we have so found. The depreciation allowable should be recomputed on that basis. The situation is different with respect to the Building Repairs Account. In this instance respondent made no downward adjudgment but allowed the depreciation claimed by petitioner in its return. It appears that it had been petitioner's practice to depreciate this account on a 20-year basis, but petitioner now claims that a 10-year basis would be more proper. We think, however, that the evidence is insufficient to support a finding that the average useful life of the account was 10 years or to warrant a greater allowance for depreciation than that claimed in the return and allowed by respondent on the basis of a 20-year life. As to the depreciation on this account the respondent is sustained. The third issue is whether petitioner *182 is entitled to a loss deduction in the amount of $25,000. In the taxable year petitioner paid that amount upon the principal of its own mortgage notes to prevent, it is contended, foreclosure of the mortgage with a consequent loss to petitioner of several hundred thousand dollars. Although petitioner no longer owns the mortgaged property, the mortgagee refused to release petitioner from its original liability on the mortgage notes. However, when the property was transferred to the Realty Co., that company agreed to assume and pay the mortgage, and it carried the mortgage liability upon its books. As between petitioner and the Realty Co., petitioner had a right to reimbursement for the payment made. While petitioner charged the payment off to profit and loss on its own books, the Realty Co. on its books reduced the mortgage liability by $25,000 and increased its account payable to petitioner by a like amount. Unless the right to reimbursement was wholly worthless in the year the payment was made, we think it cannot be said that petitioner sustained a loss, evidenced by a closed and completed transaction, and "not compensated for by insurance or otherwise," within the meaning of the *183 statute and the regulations. Section 23(f). Internal Revenue Code; Regulations 103, section 19.23(e)-1. It is true that in the taxable year the liabilities plus capital stock of the Realty Co. exceeded its assets, but that condition does not appear to be an abnormal one for the company. In the relationship between the two companies a similar condition appears to have existed for a great many years. See e.g., Denholm & McKay Co., 39 B.T.A. 767. In any event, the Realty Co. was not hopelessly insolvent in the taxable year, but it was then, for many years prior thereto had been, and still is, a going concern. The law of course did not require petitioner to be an "incorrigible optimist," United States v. S. S. White Dental Mfg. Co., 274 U.S. 398; but, in the circumstances here present, it cannot fairly be said that the possibility of recoupment was a mere "remote hope." Actually in years subsequent to the taxable year petitioner made further payments on account of the mortgage, in all totalling about $335,000, and on brief petitioner discloses that after the hearing in this proceeding it recovered the entire amount. We conclude that in the taxable year petitioner *184 sustained no loss on account of the $25,000 payment, and that respondent did not err in disallowing the claimed deduction. Decision will be entered under Rule 50.